# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 5, 2005          Decided June 24, 2005

No. 04-7059

PHYLLIS J. OUTLAW,
APPELLANT

v.

AIRTECH AIR CONDITIONING AND HEATING, INC. AND
GDS ASSOCIATES,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv00570)

———

*Michael K. Guss*, pro hac vice, argued the cause for appellant. On the brief was *Phyllis J. Outlaw*, pro se.

*Robert R. Bowie, Jr.*, pro hac vice, argued the cause for appellee Airtech Air Conditioning and Heating, Inc. On the brief was *Matthew G. Hjortsberg*.

Before: EDWARDS, ROGERS, and ROBERTS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Plaintiff's notice of appeal in this case was premature, filed while claims were still pending against one of three defendants. The district court subsequently

dismissed the remaining claims without prejudice in an effort to cure the lack of an appealable final order, but no new notice of appeal was filed. Federal Rule of Appellate Procedure 4(a)(2) specifies that a premature notice of appeal may be effective upon entry of judgment in certain circumstances. In *FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 276 (1991), the Supreme Court explained that Rule 4(a)(2) applied when a notice of appeal sought review of a nonfinal decision that "*would be* appealable if immediately followed by the entry of judgment." Here the nonfinal decision would have been appealable if followed by entry of judgment under Federal Rule of Civil Procedure 54(b), and accordingly we conclude that we have appellate jurisdiction.

On the merits, we affirm the district court's grant of summary judgment for the defendants.

## I.

In March 2000, Phyllis Outlaw wanted to renovate the Washington, D.C. building she had recently purchased. To this end, she first hired GDS Associates to draw up the architectural plans required to secure construction permits — plans that included renovations of the building's heating, ventilation, and air conditioning ("HVAC") system. Outlaw then retained J.B. Builders as the general contractor responsible for "achiev[ing] Substantial Completion of the entire Work." J.B. Builders Contract, art. 3.1. J.B. Builders in turn subcontracted furnishing and installing the HVAC system to Airtech Air Conditioning and Heating, Inc.

On April 28, 2000, GDS secured the first construction permit, and work began. As each phase of the project was completed, J.B. Builders would receive a cash draw, and another firm retained by Outlaw — Home Consulting Plus — would inspect the project. Outlaw was a very hands-on owner, ordering several changes to the original plans, involving herself in

selecting construction materials, and attending to other details usually handled by a general contractor. As work progressed on the building, relations between Outlaw and her hires deteriorated. On June 22, 2000, Outlaw ended her relationship with GDS because of its purported failure to secure permits in a timely fashion. Work on the building continued, but Outlaw and J.B. Builders also had a falling out, this one over construction delays and the amount of payment due. They parted ways in November 2000, and soon thereafter Outlaw offered to pay Airtech the balance owed to it by J.B. Builders, in exchange for Airtech completing work on the HVAC system. Airtech declined, explaining it was bound contractually only to J.B. Builders. Outlaw then hired another firm to finish the work in Airtech's stead.

Outlaw alleges that after moving into the building, she discovered that the new HVAC system did not work properly. Having released J.B. Builders from any liability in a September 2001 settlement agreement, in March 2002 Outlaw sued GDS, Home Consulting, and Airtech in the Superior Court of the District of Columbia, alleging breach of contract and seeking $100,000 in damages. The defendants removed the case to the District Court for the District of Columbia on the basis of diversity.

In April 2003, that court stayed proceedings against Home Consulting, pending the conclusion of binding arbitration pursuant to its contract with Outlaw. On March 30, 2004, the court granted summary judgment in favor of Airtech and GDS, and requested a status report from Outlaw and Home Consulting on the progress of their arbitration. On April 26, 2004, however, Outlaw filed a notice of appeal seeking review of the summary judgment order. On April 30, she filed the requested status report with the district court, informing the court that the notice of appeal had been filed and stating that "[o]nce the appeal is ruled upon, the Plaintiff and [Home Consulting] may engage in

arbitration depending upon the Court's ruling." The district court promptly perceived that this building renovation dispute was about to become a federal appellate jurisdiction one as well, given the general rule that only orders disposing of all claims against all parties are final and appealable. Accordingly, on May 6, 2004, the district court *sua sponte* dismissed the pending claims against Home Consulting without prejudice, noting that "[o]therwise, there may be some question whether the Court's [summary judgment] Order represents a final judgment that may be appealed at this time. *See* Fed.R.Civ.P. 54(b)." Order of May 6, 2004, at 2. Outlaw did not file a new notice of appeal.

The parties' briefs on appeal did not raise any question concerning our jurisdiction. Shortly before oral argument, we directed "[t]he parties [to] be prepared to discuss whether this court has appellate jurisdiction, given the apparently premature filing of the notice of appeal. *See FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269 (1991); *Holland v. Williams Mountain Coal Co.*, 2004 WL 2713122 (D.C. Cir. Nov. 23, 2004)."

## II.

"Jurisdiction is, of necessity, the first issue for an Article III court." *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981). The timely filing of a notice of appeal is "mandatory and jurisdictional," *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 203 (1988); *United States v. Robinson*, 361 U.S. 220, 224 (1960), and accordingly we are required to address any questions on the issue, even in the absence of objection from the parties.

Our jurisdiction under 28 U.S.C. § 1291 generally extends only to final district court orders. *See DSMC Inc. v. Convera Corp.*, 349 F.3d 679, 682 (D.C. Cir. 2003). The order from which Outlaw purported to appeal — the district court's grant of summary judgment — was not an appealable final order

because the claims against Home Consulting were still pending at the time of its issuance. "It is elementary that a grant of summary judgment as to some parties in a multi-party litigation does not constitute a final order unless the requirements of Fed.R.Civ.P. 54(b) are met." *Brookens v. White*, 795 F.2d 178, 179 (D.C. Cir. 1986) (*per curiam*). The district court did not make the required determination or direct the entry of judgment under Rule 54(b), so Outlaw's notice of appeal was plainly premature.

Federal Rule of Appellate Procedure 4(a)(2) addresses such premature notices of appeal. It provides that "[a] notice of appeal filed after the court announces a decision or order — but before the entry of the judgment or order — is treated as filed on the date of and after the entry." The Supreme Court considered Rule 4(a)(2) in *FirsTier*. In that case, the notice of appeal was filed after the district judge announced from the bench that he was granting summary judgment on all claims, but before the judge entered findings of fact and conclusions of law. The Supreme Court concluded that Rule 4(a)(2) operated to make the premature appeal effective after the subsequent entry of final judgment.

The Court explained that the rule "was intended to protect the unskilled litigant who files a notice of appeal from a decision that he reasonably but mistakenly believes to be a final judgment, while failing to file a notice of appeal from the actual final judgment." 498 U.S. at 276. The Rule would not rescue a notice of appeal "from a clearly interlocutory decision — such as a discovery ruling or a sanction under Rule 11," because a "belief that such a decision is a final judgment would *not* be reasonable." *Id.* The Court then concluded that "Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would be* appealable if immediately followed by the entry of judgment." *Id.* In such cases, the

Court explained, "a litigant's confusion is understandable, and permitting the notice of appeal to become effective when judgment is entered does not catch the appellees by surprise." *Id.*

Deciding whether we had appellate jurisdiction here would have been easy prior to *FirsTier*. We had a line of precedent dating back at least to *Sacks v. Rothberg*, 845 F.2d 1098, 1099 (D.C. Cir. 1988), in which we held that "an appeal taken prematurely effectively ripens and secures appellate jurisdiction when the district court's judgment becomes final prior to disposition of the appeal." We have regularly relied on that line of authority subsequent to *FirsTier*, *see, e.g., Alegria v. District of Columbia*, 391 F.3d 262, 264 (D.C. Cir. 2004); *United States v. Real Property Identified as Parcel 03179-005R*, No. 04-5217, 2004 WL 1859778 (D.C. Cir. Aug. 19, 2004); *Cebula v. Bush*, No. 91-5385, 1993 WL 45836 (D.C. Cir. Feb. 16, 1993), but in no case have we addressed its continuing validity in light of *FirsTier*. This state of affairs is not unique to our court, given that, prior to *FirsTier*, many circuits had a broader understanding of when a premature notice of appeal could become effective. *See, e.g., Alcorn County v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1165–66 (5th Cir.1984); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 184–85 (3d Cir.1983); *Baker v. Limber*, 647 F.2d 912, 916 (9th Cir.1981); *Merchants & Planters Bank of Newport v. Smith*, 516 F.2d 355, 356 n.3 (8th Cir.1975). We agree with decisions concluding that those prior lines of precedent must be limited in light of *FirsTier*.[1] *See United States v. Cooper*, 135 F.3d 960, 963 (5th Cir. 1998) ("we recognize that in light of *FirsTier*, this expansive view of appellate jurisdiction

---

[1] Because this part of our opinion rejects a prior statement of circuit precedent, it has been considered separately and approved by the full court. *See Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981).

cannot survive"); *Serine v. Peterson*, 989 F.2d 371, 372 (9th Cir. 1993).[2]

The reach of Rule 4(a)(2) after *FirsTier*, however, remains somewhat unclear. Asking whether a decision is one that an unskilled litigant "reasonably but mistakenly believes to be a final judgment" is a rather imprecise guide for a jurisdictional rule. *FirsTier*, 498 U.S. at 276. The examples that the Court gave of situations in which Rule 4(a)(2) would *not* save a

---

[2] In *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 586–87 (3d Cir. 1999), the Third Circuit noted that some courts were revisiting their precedents in light of *FirsTier*, but declined to join the enterprise, holding that its precedent similar to *Sacks* was not overruled by *FirsTier*. We do not see how a broader notion of when a notice of appeal filed before entry of judgment may be effective can survive the Supreme Court's narrower construction of the specific appellate rule governing such notices of appeal, without rendering the rule largely if not entirely superfluous. *See FirsTier*, 498 U.S. at 276 ("Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment *only* when a district court announces a decision that would be appealable if immediately followed by the entry of judgment") (emphasis added; other emphasis deleted). *See also United States v. Hansen*, 795 F.2d 35, 38 (7th Cir. 1986) ("Rule 4(a)(2) defines the circumstances in which a premature notice of appeal can be effective, and the circumstances of this case are not among them."). The *Lazy Oil* court noted that Rule 4(a)(4), added after *FirsTier*, provides that a notice of appeal that is filed *after* judgment but is premature because filed before disposition of post-judgment motions becomes effective upon denial of the motions, and concluded "[t]hus, in a number of factual situations, a premature notice of appeal will become effective at a later date." 116 F.3d at 587. The fact that there is a rule governing pre-judgment premature notices of appeal and another rule governing post-judgment premature notices of appeal hardly means that courts are at liberty to fashion additional doctrines saving premature notices of appeal that are not saved under the rules, as construed by the Supreme Court.

premature appeal — clearly interlocutory decisions such as discovery rulings, *see id.* — and the counterexamples of situations in which the Rule *would* — orders dismissing a complaint without actually dismissing the action, *see id.* at 275 — leave a vast middle ground of uncertainty. Still, the Court's articulation of its test for applying Rule 4(a)(2) provides some direction. The Rule is effective when there is a notice of appeal from a "nonfinal decision" that "*would be* appealable if immediately followed by the entry of judgment." *Id.* at 276. The Federal Rules of Civil Procedure define a "judgment" as a "decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a). An appeal generally does not lie from a "nonfinal decision," so the Court's test would seem to be satisfied only when the hypothetical entry of judgment somehow makes the "nonfinal decision" from which an appeal was noted final and therefore appealable. That was presumably the case in *FirsTier* itself, where it appears that the district court's announced intention to consider and enter written findings and conclusions to support its oral ruling was the only thing that made its oral decision "nonfinal." Had the district court instead entered judgment immediately after its oral ruling, that would have rendered the decision final and appealable.

Simple entry of judgment would not have had the same effect here. Outlaw's claims against Home Consulting were still pending, and entering judgment alone would not have affected the aspect of the March 30 order rendering it nonfinal and nonappealable. *See Holland v. Williams Mountain Coal Co.*, No. 04-7092, 2004 WL 2713122 (D.C. Cir. Nov. 23, 2004) (*per curiam*) (denying appellate jurisdiction under *FirsTier* when amount of fee award remained to be established); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1483 (9th Cir. 1996) (same).

Entry of judgment pursuant to Federal Rule of Civil Procedure 54(b), however, would have made the March 30 order appealable. *FirsTier* did not present a situation implicating Rule

54(b)'s provision for entry of judgment on fewer than all claims or against fewer than all parties. Neither did any of the cases discussed in *FirsTier*. "[B]ut nothing in *FirsTier* indicates that its holding does not apply to such judgments," *In re Bryson*, 406 F.3d 284, 288 (4th Cir. 2005), and several circuits have concluded that *FirsTier*'s reference to decisions that "*would be* appealable if immediately followed by the entry of judgment" encompasses "entry of judgment" pursuant to Rule 54(b), *see, e.g., Bryson*, 406 F.3d at 287–89; *Swope v. Columbian Chemicals Co.*, 281 F.3d 185, 191–92 (5th Cir. 2002); *Good v. Ohio Edison Co.*, 104 F.3d 93, 95–96 (6th Cir. 1997); *Clausen v. Sea-3, Inc.*, 21 F.3d 1181, 1186–87 (1st Cir. 1994). *Cf. Tidler v. Eli Lilly & Co.*, 824 F.2d 84 (D.C. Cir. 1987) (*per curiam*) (holding, prior to *FirsTier*, that premature notice of appeal was effective after entry of Rule 54(b) judgment).

Here the district court did not enter judgment pursuant to Rule 54(b). The court cited the Rule, but it appears to have referenced the last sentence, by way of explaining why the March 30, 2004 order was not a final judgment. *See* Fed. R. Civ. P. 54(b) ("In the absence of [the required] determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."). Instead of entering judgment under Rule 54(b), the district court dismissed the remaining claims without prejudice.

Under the test articulated in *FirsTier*, however, that should not doom the appeal. That test asks hypothetically whether the "nonfinal decision" from which an appeal was noted "*would be* appealable *if* immediately followed by the entry of judgment." 498 U.S. at 276 (latter emphasis added). The analysis was

hypothetical in *FirsTier* itself; the oral decision in that case was not in fact immediately followed by entry of judgment but instead by written findings of fact and conclusions of law, and only then by entry of judgment. *See id.* at 272. There must at some point prior to consideration of the appeal actually have been a final appealable judgment of some sort entered; Rule 4(a)(2) by its terms makes a premature notice effective "on the date of and after the entry [of judgment]." Although the hypothetical judgment in *FirsTier* was identical to the kind of judgment eventually entered, nothing in *FirsTier* requires that the hypothetical judgment considered in applying its test be the same type as the one actually entered. *See Bryson*, 406 F.3d at 287–90; *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 378–79 (5th Cir. 1996). So Outlaw's premature notice of appeal is treated, under Rule 4(a)(2) and *FirsTier*, as if filed on the date of and after entry of judgment in this case.

With the May 6 order, all pending claims against all parties were resolved. Under Federal Rule of Civil Procedure 54(a), the May 6 order accordingly constitutes a "judgment" for purposes of the rules. Fed. R. Civ. P. 54(a) (" 'Judgment' as used in these rules includes . . . any order from which an appeal lies."). *See United States v. Haynes*, 158 F.3d 1327, 1329 (D.C. Cir. 1998).

Civil Rule 58(a)(1) provides that "[e]very judgment . . . must be set forth on a separate document," but the separate document rule is often ignored and was in this case. Prior to December 1, 2002, that oversight would have saved Outlaw's appeal without the need to consider Appellate Rule 4(a)(2): her time to appeal runs from the entry of judgment, and thus would not even begin to run until the district court clerk entered the separate document required by Rule 58. *See United States v. Indrelunas*, 411 U.S. 216, 221 (1973) (*per curiam*); *Haynes*, 158 F.3d at 1329–30. Our dismissal of her appeal at most would only have temporarily postponed our ability to reach the merits, because on remand the district court would simply enter the

separate document required by Rule 58, allowing Outlaw then to file a timely appeal. Indeed, because such paper shuffling serves "no practical purpose," *Bankers Trust Co. v. Mallis*, 435 U.S. 381, 385 (1978), our cases have held that we could have taken jurisdiction directly and dispensed with the detour to the district court. *See Haynes*, 158 F.3d at 1331; *Pack v. Burns Int'l Sec. Serv.*, 130 F.3d 1071, 1072–73 (D.C. Cir. 1997).

The rules were changed in 2002, however, precisely to address the problem that a failure to comply with the separate document rule meant that the time to appeal never expired because it never began to run. Civil Rule 58(b) was amended to provide that, if Rule 58(a)(1) requires that a judgment be set forth on a separate document (as it does here), the judgment is considered entered when it is entered on the docket and (1) set forth on a separate document, or (2) 150 days have run after entry on the docket, whichever is earlier. Appellate Rule 4(a)(7) was correspondingly amended to adopt the same test for determining when the time to appeal begins to run. The purpose of these changes was to "ensure that parties will not be given forever to appeal . . . when a court fails to set forth a judgment or order on a separate document in violation of Fed. R. Civ .P. 58(a)(1)." Fed. R. App. P. 4, advisory committee notes (2002 amendments). *See* 16A Wright, Miller, Cooper, & Schiltz, Federal Practice and Procedure § 3950.2, at 26 (3d ed. Supp. 2005); *TDK Electronics Corp. v. Draiman*, 321 F.3d 677, 679 (7th Cir. 2003).

Accordingly, judgment is considered entered in this case, for purposes of determining the time to appeal, 150 days after entry of the May 6 order. Fed. R. App. P. 4(a)(7)(A)(ii). Outlaw's time to appeal began to run on October 4, 2004 (applying Federal Rule of Civil Procedure 6), and under Appellate Rule 4(a)(2) her premature notice of appeal is treated as filed on that date. Accordingly, we turn (at last) to the merits of Outlaw's appeal.

**III.**

**A.** We first address Outlaw's contention that the district court improperly granted summary judgment for GDS. In the proceedings below, Outlaw relied on two sources besides her own testimony to support her claim that the HVAC system was deficient. First, she presented a report from a September 6, 2001 District of Columbia inspection that revealed a gas line running through the air conditioning unit, a code violation the report said "causes serious concern." *Outlaw v. Airtech Air Conditioning & Heating, Inc.*, No. 02-0570, slip op. at 6 (D.D.C. Mar. 30, 2004). Second, Outlaw submitted a report from a November 23, 2001 evaluation by a certified home inspector she had retained. As the district court noted, the report "presents a litany of shortcomings in the design and installation of the HVAC system," but also "cites no specific code violations" and concludes "that the cooling differentials all met accepted industry standards [as] of the time of inspection." *Id.* (internal quotation marks omitted). Based on this record, the court held that Outlaw had provided no evidence linking GDS's design plans to the alleged defects in the HVAC system, and that she had not identified any code provision that the design violated.

Outlaw gives us no reason to reverse the district court's conclusions. Neither evaluation produced by Outlaw addressed the designs GDS submitted, and she has not made any other kind of demonstration indicating how GDS's plans were a cause in fact of the alleged deficiencies, let alone a proximate cause. Outlaw only directs our attention to a host of out-of-District decisions, none of which excuses her from having to raise some material fact that reasonably could be read as attributing breach to GDS. When there is a construction defect, the architect is one of the usual suspects, but GDS's proximity to the problem and Outlaw's accusation alone are not enough to survive summary judgment.

Nor do we disturb the district court's rejection of Outlaw's

argument that GDS breached by failing to secure the permits in a timely fashion. The court reasoned that the contract did not stipulate a time for securing the permits, and that any nonperformance by GDS after June 22, 2000, was excused because Outlaw repudiated their contract. Outlaw challenges these conclusions only by arguing that the trier of fact should have answered these questions. Any dispute about the facts surrounding the June 22 separation would be a question for a jury, but there are none at issue. Indeed, Outlaw did not allege with any particularity how GDS's performance was unsatisfactory in light of the contract or course of dealing. If anything, the evidence runs against Outlaw's claim of breach: soon after she hired another architect, the District issued a second, apparently final, permit authorizing "alterations to exiting [sic] building per plans" that were submitted on March 27, 2000, when GDS was still in Outlaw's employ. *Outlaw*, slip. op. at 3 n.2. The only question was the legal significance of the facts on the record, a question of law for a judge, notwithstanding Outlaw's desire to have a jury make those determinations.

**B.** The district court granted summary judgment for Airtech because its agreement with J.B. Builders created no duty on the part of Airtech to Outlaw. The district court reached this conclusion based on the traditional contract law rule that, absent any indication to the contrary in an agreement, property owners are not intended or third-party beneficiaries of contracts between contractors and subcontractors. *See* Restatement (Second) of Contracts § 302 cmt. e. & illus. 19 (1981); 9 Corbin on Contracts § 779D (Interim ed. 2002); *see also Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 535–36 (3d Cir. 1988).

Outlaw does not dispute that District of Columbia courts, whose substantive law we follow in this diversity case, look to the Restatement "[i]n the absence of any current well-developed doctrine in [their] jurisdiction." *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 618 (D.C. 1989). Instead, Outlaw

contends there *is* District of Columbia precedent on point — *Western Union Tel. Co. v. Massman Constr. Co.*, 402 A.2d 1275 (D.C. 1979) — and that it is in her favor. In that case, a construction firm entered into a contract with the transit authority to build part of a subway system. A telegraph company that had not signed the contract, but whose lines were damaged by the construction, was able to recover from the construction firm on that contract as a third-party beneficiary. *Id.* at 1277.

This case is readily distinguishable from *Western Union*. Essential to the holding in *Western Union* was language in the contract affording the plaintiff telegraph company an active role in the project and specifically assigning the defendant construction company the responsibility to repair any damage it caused to the plaintiff's telegraph lines. *See id.* These provisions conferred on the plaintiff the status of a third-party beneficiary and took the case outside the traditional rule applied by the district court. Outlaw can invoke no such exception here. The form contract between Airtech and J.B. Builders contemplates no role for Outlaw and cannot be read as creating specific rights for her; beyond allowing the "Owner" to "keep any and all parts" and bearing a signature line "Owner/General Contractor" (here signed by J.B. Builders), the form contract does not refer to an owner at all, let alone Outlaw in particular. *See* Airtech Contract at 1–2. Nor did the course of dealing make Outlaw a third-party beneficiary. She played no role in J.B. Builders' choice of Airtech as a subcontractor and, although Outlaw vigorously involved herself in the construction project, Airtech did not acquiesce in her efforts to step into J.B. Builders' shoes.

The judgment of the district court is

*Affirmed*.